# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**


## NO. 2-09-350-CV

BURT EUGENE HYDE, M.D.                                       APPELLANT

V.

DOROTHY MENEFEE, INDIVIDUALLY                               APPELLEES
AND AS NEXT FRIEND OF EVOLLA TUTT,
AND EVOLLA TUTT

------------

### FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In a single issue, Appellant Burt Eugene Hyde, M.D. brings this interlocutory appeal from the denial of his motion to dismiss the health care liability claim filed against him by Appellees Dorothy Menefee, individually and as next friend of Evolla Tutt and Evolla Tutt . *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (Vernon 2008). We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

On February 25, 2007, Appellee Dorothy Menefee brought her sixteen-year-old daughter, Evolla Tutt, to Millwood Hospital, a psychiatric facility, for treatment of a major depressive disorder with psychosis. Tutt had previously been diagnosed with Schizoaffective Disorder, and she had been suffering from increased depression and anxiety, including auditory hallucinations, for two weeks.

Dr. Hyde, a general practitioner, was the first physician to examine Tutt at Millwood Hospital; he noted an admission diagnosis of major depressive disorder with psychosis. At the time, Tutt was taking a combination of medications, including Seroquel (an antipsychotic), Concerta (an amphetamine used for treatment of attention-deficit disorder), and Zoloft (an antidepressant). Dr. Hyde ordered the continuation of Tutt's current medications and the administration of a combination of medication, including Haldol (an antipsychotic), Ativan (an anticonvulsant), and Benadryl,[2] as needed if Tutt became "agitated or very upset." Dr. Hyde did not see Tutt again or have any further involvement in her care.

After being admitted to Millwood, Tutt became the patient of Dr. Tarakumar Reddy, M.D. Dr. Reddy entered new orders discontinuing the Concerta, increasing the Zoloft and Seroquel dosages, and leaving in place Dr. Hyde's order for the Haldol cocktail. Tutt was not given the Haldol cocktail prior to the entry of Dr.

---

[2] We will refer to the combination of Haldol, Ativan and Benadryl as the the "Haldol cocktail."

Reddy's February 25 orders, but she did receive three doses of the Haldol cocktail on February 26.

On February 28, Tutt was transferred from Millwood to the emergency room at Arlington Memorial Hospital. At the time of admission, Tutt was described as drooling, non-verbal, and trembling. Several hours later, Menefee took Tutt by private car to North Hills Hospital where Tutt remained a patient until March 12. During that time, one of the North Hills doctors noted a possible diagnosis of Neuroleptic Malignant Syndrome ("NMS"). Menefee alleges that Tutt's NMS caused seizures between March 4 and March 11 that resulted in "substantial brain damage and permanent, debilitating physical and mental impairment." Tutt was transferred to Children's Medical Center in Dallas on March 12 and was discharged from there in June.

Menefee and Tutt sued thirty defendants, including Dr. Hyde, for negligence and served Dr. J. Boswell Tabler's expert report with their original petition. Dr. Hyde objected to the expert report's sufficiency and moved to dismiss Menefee and Tutt's claim under civil practice and remedies code section 74.351. After a hearing, the trial court denied Dr. Hyde's motion to dismiss, and this interlocutory appeal followed.

### III. Expert Report

In his sole issue, Dr. Hyde argues that the trial court erred by denying his motion to dismiss. Specifically, Dr. Hyde argues that Dr. Tabler's expert report does

not satisfy the requirements of civil practice and remedies code section 74.351 because it fails to establish a discernible standard of care applicable to Dr. Hyde, fails to set forth a breach of that standard "in anything but a conclusory manner," and fails to establish a causal link between Dr. Hyde's alleged misconduct and the harm Tutt allegedly suffered.

## A. Standard of Review

A trial court's ruling concerning an expert report under section 74.351 (formerly article 4590i, section 13.01) of the Medical Liability and Insurance Act is reviewable under the abuse of discretion standard. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2009); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

## B. Applicable Law

4

A health care liability claimant must serve an expert report on each defendant no later than the 120th day after the claim is filed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). A defendant may challenge the adequacy of a report by filing a motion to dismiss, and the trial court must grant the motion to dismiss if it finds, after a hearing, that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id*. § 74.351(*l*). While the expert report "need not marshal all of the plaintiff's proof," it must provide a fair summary of the expert's opinions as to the "applicable standard[ ] of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id*. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 878 (construing former article 4590i, § 13.01).

To constitute a good faith effort, the report must discuss the standard of care, breach, and causation with sufficient specificity (1) to inform the defendant of the conduct the plaintiff has called into question and (2) to provide the trial court with a basis to conclude that the claims have merit. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. But the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46

5

S.W.3d at 879. When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878.

## C. Analysis

Dr. Hyde argues that Dr. Tabler's expert report is conclusory and does not sufficiently detail the standard of care, breach of the standard of care, or causation as to Dr. Hyde.

### 1. Standard of Care and Breach

Although he acknowledges that the expert report identifies three specific duties he owed to Tutt, Dr. Hyde argues that these duties are stated only as "broad generalities" and that the report does not set forth a "specific standard of care." Dr. Hyde also contends that Dr. Tabler's report does not explain why or how Dr. Hyde breached these standards of care.

The relevant portions of Dr. Tabler's expert report state:

Dr. Hyde initially evaluated the patient upon her admission to Millwood Hospital on February 25–26, 2007. At this time, Dr. Hyde owed a duty to the patient to make appropriate decisions concerning her course of psychiatric medication treatment. Dr. Hyde improperly continued the drug Concerta for the patient, a stimulant medication used to treat Attention Deficit Disorder, in spite of this drug's contraindication per its label for individuals experiencing agitation and/or psychosis. . . .

Dr. Hyde also owed a duty to the patient to prescribe a course of psychiatric treatment that would not endanger her safety while treating her underlying psychiatric condition. Dr. Hyde failed the patient by

6

beginning her initial "cocktail" utilizing dosages and combinations that failed to treat the patient's condition without inducing a life-threatening neurological condition. . . .

Dr. Hyde had a further duty to closely monitor the patient's condition for any signs or symptoms of adverse reaction to the psychiatric drug "cocktail" administered to her as treatment of her mental state. Dr. Hyde's failure to initiate a course of psychiatric medications that would consider the presentation of the patient from February 27 to February 29, 2007 [sic] as a potential life-threatening condition resulted in the continued administration of the "cocktail," contributing to the patient's eventual seizures that resulted in her injuries.

Dr. Tabler's report adequately describes Dr. Hyde's duties and alleged breaches of duty. The report states that Dr. Hyde: (1) had a duty to make appropriate decisions concerning Tutt's medication treatment and allegedly breached this duty by improperly continuing Concerta, a contraindicated stimulant; (2) had a duty to treat Tutt's underlying psychiatric condition while not endangering her safety and allegedly breached this duty by not treating Tutt's condition and improperly using medication dosages and combinations that induced a life-threatening neurological condition; and (3) had a duty to closely monitor Tutt for signs of an adverse reaction to the medication and allegedly breached this duty by not recognizing Tutt was in a potentially life-threatening condition and by continuing the same medications she had been taking. Other sections of Dr. Tabler's report provide that NMS "is a potentially-fatal brain and bodily disorder," that the risk of developing NMS increases with, among other things, the use of "high potency agents" such as Haldol, that Dr. Hyde prescribed the Haldol cocktail for Tutt, and

7

that Tutt received at least three doses of the Haldol cocktail. These statements, all contained within the four corners of Dr. Tabler's report, are sufficient to inform Dr. Hyde of the specific conduct Menefee and Tutt have called into question and provide a basis for the trial court to conclude that the claim has merit. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879; *see also Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 121–22 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding expert report sufficiently set forth standard of care and breach of standard of care).

Dr. Hyde asserts two other arguments concerning the standard of care and breach. He first argues that Dr. Tabler's report takes issue with Dr. Reddy's, not Dr. Hyde's, decision to continue the Haldol cocktail. But this argument is unavailing because Dr. Tabler's report specifically states that Tutt received three doses of the Haldol cocktail and that it was a breach of the standard of care for Dr. Hyde to prescribe the Haldol cocktail without regard to Dr. Reddy's alleged negligence. Second, Dr. Hyde contends that Dr. Tabler's report attempts to establish "a global and generic 'Standard of Care at Millwood'" but that this standard of care does not apply to him. We need not address this argument, however, because Dr. Tabler's report, independent of this alleged "global and generic standard of care," sufficiently describes specific duties Dr. Hyde owed to Tutt and his alleged breaches of those duties. *See* Tex. R. App. P. 47.1.

8

The trial court did not abuse its discretion by finding that Dr. Tabler's report sufficiently addressed the elements of duty and breach of duty.

## 2. Causation

Dr. Hyde also argues that Dr. Tabler's report fails to "connect the dots and specifically explain how [Dr. Hyde's] conduct resulted in Ms. Tutt receiving this toxic combination of medication and how the medication brought about the damages alleged." We disagree.

Read as a whole, Dr. Tabler's report sufficiently links his causation opinions to the facts. Among other things, the report states: (1) Hyde admitted Tutt to Millwood on February 25, 2007, for treatment of a major depressive disorder with psychosis; (2) Hyde continued Tutt's medication combination, which included Seroquel and Concerta; (3) the continued administration of Concerta "more likely than not contributed to the hospital's difficulties in abating [Tutt]'s admission psychosis and encouraged the use of Haldol"; (4) Dr. Reddy discontinued Dr. Hyde's Concerta order on February 25;[3] (5) Dr. Hyde prescribed the Haldol cocktail for Tutt as needed; (6) Tutt received at least three doses of the Haldol cocktail; (7) the

---

[3] Dr. Hyde argues the discontinuation of the Concerta means that his "Concerta order could not have contributed to any harm suffered by Ms. Tutt." But Dr. Hyde prefaces his argument on there being "no evidence Ms. Tutt ever received Concerta at Millwood." Not only does this argument reach beyond the four corners of Dr. Tabler's report, but it improperly seeks to require a level of detail required in a summary judgment proceeding or at a trial. *See Palacios*, 46 S.W.3d at 879. The argument also ignores Dr. Hyde's order for the Haldol cocktail that Tutt received on at least three occasions.

9

Haldol cocktail was an "excessively-risky treatment regimen [that] resulted in the patient's initial neurological crisis"; (8) the risk of developing NMS increases with, among other things, patient agitation, the "use of high potency agents" such as Haldol, and the "concomitant use of predisposing drugs (Haldol + Seroquel)"; (9) NMS "is a potentially-fatal brain and bodily disorder with sequelae requiring active medication treatment if suspected to prevent complications"; (10) the continued administration of the Haldol cocktail "contribut[ed] to the patient's eventual seizures that resulted in her injuries"; and (11) "the tragedy that occurred was a direct result of a combination of the above medication. The patient was overly sedated and any potential over sedation requires special medical care." These statements, all contained within the four corners of Dr. Tabler's report, sufficiently link Dr. Tabler's causation opinions to the facts. *See Patel v. Williams*, 237 S.W.3d 901, 905–06 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding expert report sufficiently set forth causation when it presented a chain of events beginning with a contraindicated prescription and ending with the patient's death). The trial court acted within its discretion in finding that Dr. Tabler's report sufficiently addressed the element of causation.

We hold that the trial court was justified in finding that Dr. Tabler's report discusses the standard of care, breach, and causation with sufficient specificity to fulfill the statutory requirements. We therefore overrule Dr. Hyde's sole issue.

### IV. Conclusion

10

Having overruled Dr. Hyde's sole issue, we affirm the trial court's order.


BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  April 29, 2010